**Seth H. Row**, OSB No. 021845
seth.row@millernash.com
**Katelyn J. Fulton**, OSB No. 183404
katelyn.fulton@millernash.com
MILLER NASH GRAHAM & DUNN LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  503.224.5858
Facsimile:  503.224.0155

      *Attorneys for Proposed Amici Curiae United*
      *Policyholders and National Independent*
      *Venue Association*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DAKOTA VENTURES, LLC d/b/a KOKOPELLI GRILL and COYOTE BBQ PUB, individually and on behalf of all others similarly situated, | No. 3:20-cv-00630-HZ |
| Plaintiffs, | MOTION BY UNITED POLICYHOLDERS AND NATIONAL INDEPENDENT VENUE ASSOCIATION TO APPEAR AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS |
| v. | |
| OREGON MUTUAL INSURANCE CO., | |
| Defendant. | |

**LR 7-1 CERTIFICATION**

Counsel for proposed *amici curiae* indicated below certifies that prior to filing this motion counsel conferred with counsel for plaintiff and defendant.  Plaintiff does not oppose the relief sought here; Defendant opposes the relief sought.

Page 1 -    Motion to Appear as *Amici Curiae*

## MOTION

Proposed *amici curiae* parties move the Court for an Order permitting them to appear as *amici curiae* in support of Plaintiff's response to Defendant's Motion to Dismiss (Ct. Rec. 17) and to consider the attached brief in connection with that motion.

## MEMORANDUM

A.    Legal Standard.

The Court has broad discretion to appoint amicus curiae.  *See Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *see also In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006) (district courts have inherent authority and broad discretion to grant leave to file an amicus brief); *Stauart v. Huff*, 706 F.3d 345, 355 (4th Cir. 2013) (same); *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 136 (D. D.C. 2008) (same); *James Square Nursing Home, Inc. v. Wing*, 897 F. Supp. 682, 683 n.2 (N.D. N.Y. 1995) (same).

The classic role of an amicus curiae is to assist the Court "in a case of general public interest, supplementing the efforts of counsel [for the parties], and drawing the court's attention to law that escaped consideration." *Miller-Wohl Co., Inc. v. Comm'r of Labor and Indus.*, 694 F.2d 203 204 (9th Cir. 1982).  *Amici* assist "in cases of general public interest by making suggestions to the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision."  *Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*, 940 F.2d 792, 808 (3d Cir. 1991) (citations omitted).

Courts often grant leave to nonprofit organizations like United Policyholders and the other proposed *amici* with knowledge and perspective that may assist in the resolution of the case.  *See Bryant v. Better Bus. Bureau*, 923 F. Supp. 720, 728 (D. Md. 1996); *see also Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 357 (E.D. Va. 2009).

Page 2 -    Motion to Appear as *Amici Curiae*

4848-6049-8370.1

This Court has so exercised its inherent authority and discretion previously. *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1228 (D. Or. 2019), *appeal dismissed,* No. 19-35178, 2019 WL 2613191 (9th Cir. June 12, 2019), and *appeal dismissed,* No. 19-35179, 2019 WL 2552333 (9th Cir. June 13, 2019); *Central Oregon Landwatch v. Kent Connaughton et al.,* Case No. 6:13-cv-0207-AA (D. Or., August 10, 2014) (unpublished order, Ct. Rec. 121) (granting opposed motion to appear as *amici* where "[a]pplicants timely moved for permission to provide unique information and perspective concerning a matter of broad general public interest and specific local interest that will aid the Court and supplement the efforts of existing counsel.").

Although the Federal Rules of Civil Procedure do not contain a rule governing the filing of *amicus* briefs, district courts often look to Federal Rule of Appellate Procedure 29 and United States Supreme Court Rule 37 for guidance. *See, e.g.*, *Am. Humanist Ass'n v. Mid-Nat'l Capital Park & Planning Comm'n*, 147 F. Supp. 3d 373, 389 (D. Md. 2015); *Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1500-01 (S.D. Fla. 1991). Rule 29 provides that a prospective *amicus* must file, along with the proposed brief, a motion that states "the movant's interest" and "the reason why an *amicus* brief is desirable and why the matters asserted are relevant to the disposition of the case." Fed. R. App. P. 29(a)(3).

B.      Interest of *Amici* in This Case.

The pending motion to dismiss is one of the earliest challenges nationwide, and *the* earliest challenge in Oregon, to a policyholder's ability to state a claim for business interruption insurance coverage stemming from the SARS-CoV-2/COVID-19 pandemic. The nature of the arguments raised by Defendant are sweeping in scope and touch on issues that are raised in similar litigation now pending in virtually every federal judicial district in the country.[1]

---

[1] *See* University of Pennsylvania Carey Law School "Covid Coverage Litigation Tracker," available at https://cclt.law.upenn.edu/ (last visited July 1, 2020).

Page 3 -     Motion to Appear as *Amici Curiae*

4848-6049-8370.1

The application and interpretation of insurance contracts requires special judicial handling.  *See Hoffman Constr. Co. v. Fred S. James & Co. of Or.*, 313 Or. 464, 469-71, 836 P.2d 703 (1992) (articulating Oregon approach to interpretation of insurance policies including differences from ordinary contract interpretation).  Not only are insurance contracts adhesive in nature, which compels judicial balancing, but effectuating indemnification in case of loss is a fundamental economic and social objective that courts can advance.  Proposed *amici* respectfully seek to assist this Court in fulfilling these important roles.

1.    United Policyholders

United Policyholders ("UP") is a non-profit, tax-exempt, charitable organization founded in 1991 that provides valuable information and assistance to the public on insurers' duties and policyholders' rights. UP monitors developments in the insurance marketplace and serves as a voice for policyholders in legislative and regulatory forums. UP helps preserve the integrity of the insurance system by educating consumers and advocating for fairness in sales and claim practices. Grants, donations and volunteers support the organization's work. UP does not accept funding from insurance companies.

UP's work is divided into three program areas:  *Roadmap to Recovery*™ (disaster recovery and claim help), *Roadmap to Preparedness* (disaster preparedness through insurance education), and *Advocacy and Action* (advancing pro-consumer laws and public policy through submission of *amicus curiae*).  UP hosts a library of informational publications and videos related to personal and commercial insurance products, coverage and the claims process at www.uphelp.org.

In furtherance of its mission, UP regularly appears as *amicus curiae* in courts nationwide to advance the policyholder's perspective on insurance cases likely to have widespread impact.  UP regularly consults with the insurance commissioners of many states, including Oregon, and has previously appeared as *amicus curiae* in cases involving Oregon

Page 4 -    Motion to Appear as *Amici Curiae*

insurance law at the Ninth Circuit Court of Appeals[2] and the Oregon Court of Appeals and the Oregon Supreme Court.[3]  UP's *amicus* brief was cited in the U.S. Supreme Court's opinion in *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999).

UP seeks to fulfill the classic role of *amicus curiae* by assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that may have escaped consideration.  *Miller-Wohl Co., Inc. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982).  As commentators have stressed, an *amicus* is often in a superior position to focus the court's attention on the broad implications of various possible rulings.  R. Stern, *E. Greggman & S. Shapiro, Supreme Court Practice*, 570-71 (1986) (quoting Ennis, *Effective Amicus Briefs*, 33 CATH. U. L. REV. 603, 608 (1984)).

2.      National Independent Venue Association

The National Independent Venue Association (NIVA) is a trade association formed in 2020 just prior to the pandemic, with nearly 2,000 charter members in all 50 states. NIVA's members are independent performing-arts venues, both for- and non-profit, employing thousands of people, and are part of the cultural backbone of their communities.  Representative Oregon members include Mississippi Studios and Revolution Hall in Portland; McMenamins in Portland and elsewhere; Portland'5 Centers for the Arts; Les Schwab Amphitheater and Bend Summer Concerts in Bend; The Historic Rogue Theatre in Grants Pass; and Catfish Lou's in Beaverton.  Outside of Oregon, well-known members include the 9:30 Club in Washington, D.C.; World Café Live in Philadelphia, Pennsylvania; Pabst Theater Group in Milwaukee,

---

[2] *See, e.g., Amicus* Brief in *Howisey v. Transamerica Life Insurance Co.,* U.S Court of Appeals for the Ninth Circuit No. 17-36045 (brief filed 2018; motion to appear granted 765 F. App'x 219, 220, n.1 (9th Cir. 2019)).

[3] *See, e.g., Amicus* Brief (with Port of Portland) in *Allianz Global Risks US Ins. Co. v. ACE Property & Cas. Ins. Co. et al.*, Supreme Court of the State of Oregon, No. CA A159758 (brief filed April, 2020; motion to appear allowed by Court of Appeals, 297 Or. App 434 (2019)).

Wisconsin; and the Red River Cultural District in Austin, Texas. More information is available at https://www.nivassoc.org/.

        C.        The Issues Addressed by the *Amicus* Brief are Useful and Relevant to the Court's Review of Defendant's Motion to Dismiss.

Defendant's motion to dismiss asserts that a party cannot plead COVID-19 related business interruption coverage because "direct physical loss of or damage" cannot exist without structural alteration and/or visible contamination of property. The public at large has a significant interest in this issue, which is being actively litigated throughout the country. This Court's disposition of Defendant's motion has the potential to affect thousands of policyholders, not only in Oregon but nationwide.

The Court will benefit by reviewing the perspective of *amicus* UP, who has considerable experience in briefing courts on insurance coverage issues and an interest in ensuring a proper ruling under the doctrines of policy interpretation, and the perspective of hundreds of businesses that are members of proposed *amicus* NIVA. The proposed brief will provide *amici's* broad perspective on how the propensities of the SARS-CoV- 2 virus and its manifestation during this pandemic constitute "direct physical loss of or damage" under a property insurance policy, under Oregon law[4] and more generally.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[4] Proposed *amici* take no position on the choice-of-law question here.

Page 6 -    Motion to Appear as *Amici Curiae*

4848-6049-8370.1

## CONCLUSION

For the reasons set forth above this Court should enter an order granting this motion for leave to file an *amici curiae* brief and accepting the proposed *amici curiae* brief in consideration of Defendant's motion to dismiss.  A copy of the proposed brief is attached as Exhibit A.

DATED this 10th day of July, 2020.

MILLER NASH GRAHAM & DUNN LLP

*s/ Seth H. Row*

Seth H. Row, OSB No. 021845
seth.row@millernash.com
Katelyn J. Fulton, OSB No. 183404
katelyn.fulton@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155

*Attorneys for proposed Amici Curiae United Policyholders and National Independent Venue Association*

4848-6049-8370.1

**Seth H. Row**, OSB No. 021845
seth.row@millernash.com
**Katelyn J. Fulton**, OSB No. 183404
MILLER NASH GRAHAM & DUNN LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  503.224.5858
Facsimile:  503.224.0155

> *Attorneys for Amicus Curiae United*
> *Policyholders and National Independent*
> *Venue Association*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DAKOTA VENTURES, LLC d/b/a KOKOPELLI GRILL and COYOTE BBQ PUB, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>     v.<br><br>OREGON MUTUAL INSURANCE CO.,<br><br>              Defendant. | No. 3:20-cv-00630-HZ<br><br>BRIEF OF *AMICI CURIAE* UNITED POLICYHOLDERS AND NATIONAL INDEPENDENT VENUE ASSOCIATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFEDANT'S MOTION TO DISMISS |

**INTRODUCTION**

Through this brief, as supplementary to Plaintiff's opposition to Defendant's

Motion to Dismiss, *amici curiae* United Policyholders and the National Independent Venue

Page 1 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-1440-8641.2

Exhibit A
Page 1 of 14

Association ("NIVA") (collectively, *"Amici"*) [1] seek to address the limited issue that certain causes of loss can be alleged to have caused "direct physical loss of or damage."

## I.     INTEREST OF *AMICI* IN THIS MATTER

The issue of whether the current pandemic can cause "direct physical loss of or damage to" property—part of the coverage grant of Plaintiff's policy—is at the forefront of COVID-19-related business interruption litigation in Oregon and nationwide.  This Court's treatment of this issue has the potential to affect a multitude of other claims made by policyholders not only in Oregon, but across the nation.  This undefined language is found in most property insurance policies.  This Court's ruling on Defendant's motion to dismiss will likely be cited in future cases in Oregon and elsewhere, and will influence negotiation of claims that are not yet in litigation as well.

As described in *Amici*'s Motion to Appear as *Amici Curiae*, to which this brief is attached, *Amici* includes a trade organization – NIVA[2] – with members across the country that collectively employ tens of thousands of people and contribute enormously to their local economies.  According to the National Restaurant Association, the restaurant industry is one of the nation's largest private sector employers, providing jobs to 15.6 million Americans with a total economic impact of over $2.6 trillion.[3]  Restaurants have suffered the most significant job

---

[1] Pursuant to Fed. R. App. Procedure 29(a)(4), *Amici* affirm that no party's counsel authored this brief, that no party or party's counsel contributed money to any *Amicus Curiae* party that was intended to fund preparing or submitting this brief, and no person contributed money that was intended to fund preparing or submitting the brief.

[2] Information available at https://www.nivassoc.org/ (last visited July 1, 2020).

[3] *See* https://www.restaurant.org/downloads/pdfs/research/soi/2020-state-of-the-industry-factbook.pdf (last visited July 1, 2020).

Page 2 -     Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-1440-8641.2

losses since the pandemic began, with 2 out of every 3 employees having lost their jobs and over 8 million restaurant employees laid off or furloughed.[4]  Four out of every 10 restaurants nationally are or have been completely closed.[5]  Locally, over 211,000 people are employed in the Oregon foodservice industry,[6] but over 80% of those workers have been laid off or furloughed,[7] and as of late April over 4% of Oregon restaurants had closed permanently due to business income losses that made resuming operations impossible, with an expectation that many more would close.[8]

Nationally, arts and culture organizations including venues like the members of NIVA contributed over $800 billion to the nation's GDP.[9]  In 2017 over 43% of U.S. adults attended at least one live performing arts event.[10]  The arts sector employs over 67,000 people in Oregon alone, adding over $8 billion to the state economy.[11]  But like the restaurant industry, the performing arts sector has been almost completely shut down by the pandemic.[12]  Nationally, the

---

[4] *See* https://restaurant.org/manage-my-restaurant/business-operations/covid19/research/industry-research (last visited July 1, 2020).

[5] *Id.*

[6] *See* https://www.restaurant.org/downloads/pdfs/state-statistics/oregon.pdf (last visited July 1, 2020); see also https://www.oregonrla.org/facts.html (last visited July 1, 2020).

[7] *See* https://www.oregonlive.com/coronavirus/2020/04/over-80-percent-of-oregon-restaurant-workers-have-been-laid-off-or-furloughed-due-to-the-coronavirus-shutdown.html (last visited July 1, 2020).

[8] *See* https://www.oregonlive.com/coronavirus/2020/05/oregon-restaurants-and-bars-that-closed-permanent-during-coronavirus-crisis.html (last visited July 1, 2020).

[9] *See* https://www.arts.gov/news/2020/during-economic-highs-and-lows-arts-are-key-segment-us-economy (last visited July 1, 2020).

[10] *See* https://www.icpsr.umich.edu/web/pages/NADAC/index.html (last visited July 1, 2020).

[11] *See* https://www.arts.gov/artistic-fields/research-analysis/arts-data-profiles/arts-data-profile-25 (last visited July 1, 2020).

[12] *See* https://www.wyden.senate.gov/imo/media/doc/2020.05.21%20-%20Wyden-

Page 3 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

live music industry is predicted to lose almost $8 billion in revenue if performances cannot resume in 2020.[13]  Locally, NIVA members such as Roseland Theater,[14] Mississippi Studios and Revolution Hall[15] have had to cancel performances and lay off employees, incurring substantial business income losses and putting their businesses in jeopardy.[16]

Many of these businesses have made business interruption claims on policies with language similar to the language found in Plaintiff's policy, and have had their claims denied, to disastrous effect.  As explained by one court in 2008, "[t]he purpose of business interruption insurance cannot be clearer – to ensure that [the policyholder] had the financial support necessary to sustain its business in the event disaster occurred… Certainly, many business policyholders… lack the resources to continue business operations without insurance proceeds." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 194, 886 N.E.2d 127, 131 (2008).  Furthermore, continued the *Bi-Economy* court, "the purpose of the contract was not just to receive money, but to receive it promptly so that in the aftermath of a calamitous event, as Bi–Economy experienced here, the business could avoid collapse and get back on its feet as soon as possible." *Id.*, 886 N.E.2d at 132.  The insurance industry's

---

Merkley%20Letter%20to%20leadership%20on%20live%20event%20venues_final_updated.pdf (letter from United States Senators regarding aid to live music venues) (last visited July 1, 2020).

[13] *See* https://www.pollstar.com/article/pollstar-projects-2020-total-box-office-would-have-hit-122-billion-144197 (last visited July 1, 2020).

[14] *See* http://roselandpdx.com/ (last visited July 1, 2020).

[15] *See* https://mississippistudios.com/ and https://www.revolutionhall.com/ (last visited July 1, 2020).

[16] *See* https://www.wweek.com/news/2020/07/01/the-city-council-weighs-putting-federal-bailout-money-in-the-hands-of-distressed-individuals-versus-saving-entertainment-venues/ (last visited July 1, 2020).

Page 4 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

Exhibit A
Page 4 of 14

wholesale, across-the-board denial of all claims for business interruption losses related to the 2020 pandemic[17] has produced exactly the kind of calamity predicted by the *Bi-Economy* court.

This Court's ruling has the potential to impact the Oregon members of *Amici,* as well as the claims of hundreds of other members of NIVA.

## II.    SUMMARY OF ARGUMENT

As set forth herein, Defendant's position regarding interpretation of the coverage grant has been widely rejected.  Defendant chose not to define the phrase "direct physical loss of or damage to" in the policy issued to Plaintiff.  Oregon law is clear that *structural* alteration of covered property is not a necessary element of "direct physical loss of or damage,"[18] especially where the insured property is otherwise rendered unusable or unusable for its intended purpose.

In addition, contamination itself, such as the presence of a noxious or disease causing agent in and around the insured property, can constitute "direct physical loss of or damage to" property, and business interruption coverage may be triggered where contamination of insured property – even if the contamination is merely presumed or imminent – causes a "necessary suspension" (either completely or in part) of the insured business's "operations."[19]

---

[17] *See* https://www.reuters.com/article/us-health-coronavirus-chubb-wiesenthal/simon-wiesenthal-center-sues-chubb-to-ensure-coronavirus-insurance-coverage-idUSKBN22B2NP (quoting a Chubb executive as saying that "The industry will fight this tooth and nail."); *see also* https://www.washingtonpost.com/business/2020/04/22/businesses-insurance-coverage-coronavirus/ (last visited July 2, 2020).

[18] Policy language found at Ct. Rec. 1-1 at 6, *et seq.*  Plaintiff's policy contains the construction "direct physical loss of or damage to," while other policies use the construction "direct physical loss or damage to," omitting the word "of" after "loss."  The potential impact of the presence of the word "of" is beyond the scope of this brief.

[19] Policy language found at Ct. Rec. 1-1 at 12.

Page 5 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

## ANALYSIS

I.      **THE INABILITY TO USE A RESTAURANT FOR ITS INTENDED PURPOSE CONSTITUTES "DIRECT PHYSICAL LOSS OF OR DAMAGE"**

A.      **"Direct Physical Loss Of or Damage" Does Not Require Structural Alteration**

As the phrase "direct physical loss of or damage" in Plaintiff's policy is undefined, each word is given its ordinary or plain meaning. *Bighorn Logging Corp. v. Truck Ins. Exch.*, 295 Or. App. 819, 829, 437 P.3d 287, 294, *review denied,* 365 Or. 195, 451 P.3d 975 (2019).

Under a property insurance policy, the diminution of value of something, including through the failure of something to sustain its "essential functionality," can constitute a physical loss. *Oregon Shakespeare Festival Assoc. v. Great Am. Ins. Co.*, No. 15-01932, 2016 WL 3267247, *9 (D. Or. June 7, 2016), *order vacated by stipulation*, 2017 WL 1034203 (Mar. 6, 2017).

Defendant's argument that "direct physical loss of or damage" under its Policy requires *visible* or *structural* alteration of an insured structure has been rejected by Oregon courts.[20]  In *Farmers Ins. Co. v. Trutanich*, 123 Or. App. 6, 858 P.2d 1332 (1993), the Oregon Court of Appeals held that a pervasive odor from a methamphetamine lab in a rental home was

---

[20] Defendant's entire argument elides the distinction between "physical loss" and "damage," and appears to assume that the Policy requires there to have been "damage." *See, e.g.,* Defendant's Motion to Dismiss (Ct. Rec. 17) at 11 ("Plaintiff fails to state any support for its formulaic allegation that is property has been directly physically damaged.").  But the use of the disjunctive "or" between "physical loss of" and "damage" in the Policy signifies that each term ("physical loss" and "damage") has a different meaning, and creates a separate trigger for coverage, under Oregon law. *See First Mercury Ins. Co. v. Waterside Condo. Ass'n*, No. 3:12-CV-02348-ST, 2013 WL 6383883, at *10 (D. Or. Dec. 5, 2013) ("The court must assume that parties to an insurance contract do not create meaningless provisions.").

Page 6 -     Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

"accidental direct physical loss" despite the insurer's argument that odor is not "physical." *Id.,* 123 Or. App. at 10. In doing so the Oregon court adopted the reasoning of *Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 437 P.2d 52 (1968), in which the court held that a church that was closed due to gasoline vapors infiltrating the building had not merely suffered "loss of use" but had suffered "direct physical loss." *Id.,* 165 Colo. at 40, 437 P.2d 52; *see Trutanich,* 123 Or. App. at 11 (adopting *Western Fire v. First Presbyterian*); *Oregon Shakespeare Festival,* 2016 WL 3267247 at *5 (business suffered "direct physical loss of or damage to" its property when wildfire smoke in the air led to closures of outdoor theater due to health concerns, rejecting insurer's argument that air is not covered or not physical: "[c]ertainly, air is not mental or emotional, nor is it theoretical.").

A majority of courts similarly have found that structural damage is not required to show physical loss or damage, especially where the insured property cannot be used for or is unsafe for its intended purpose. *Travco Ins. Co. v. Ward*, No. 715 F. Supp. 2d 699, 708 (E.D. Va. 2010) (noting that the majority of cases nationwide find that physical damage to property is not necessary where, at least, the property has been rendered unusable by a covered cause of loss); *see also Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) ("Direct physical loss also may exist in the absence of structural damage to the insured property." (citations omitted)). This is so because:

> To accept [the insurance company's] interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. *Common sense requires*

Page 7 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

> *that a policy should not be so interpreted in the absence of a provision*
> *specifically limiting coverage in this manner.*

*Hughes v. Potomac Ins. Co.*, 18 Cal. Rptr. 650, 655 (Cal. Dist. Ct. App. 1962) (emphasis added).

As is the case in most property insurance policies, Plaintiff's policy was composed of standardized forms that were entirely within Defendant's control to draft or revise. Defendant chose not to include the word "structural," "visible," or any other term as a modifier to the terms "loss of" or "damage." As in most states, under Oregon law the insurer must bear the consequences of poor drafting and the choices that the insurer made in crafting its own policy language. *See N Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 29, 22 P.3d 739 (2001). Having failed to narrow "loss of or damage" to "structural" or "visible" damage, Defendant cannot now be heard to contend that it *meant* to include those terms.

### B.     A Property's Unsuitability for an Intended Purpose Constitutes "Physical Loss Of or Damage"

"In determining damage covered by insurance, [a] court must consider the nature and intended use of property, and the purpose of the insurance contract." *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at *28 (D. Or. June 18, 2002). A dine-in restaurant's intended purposes include providing a safe environment for its occupants, and the use and enjoyment of that property by its customers without being placed in a dangerous situation.

The inability to use the property or a portion of the property for its intended use constitutes a direct physical loss. *Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Connecticut*, No. CIV. 05-1315-JE, 2007 WL 464715, at *8 (D. Or. Feb. 7, 2007) (loss of income from damage to furnace covered although furnace could still be used, because damage rendered it unusable to treat medical products for which it had been specially certified); *see also*

Page 8 -     Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-1440-8641.2

*Matzner v. Seaco Ins. Co.*, No. 96-0498-B, 1998 WL 566658 (Mass. Super. Aug. 26, 1998) (holding the loss of use of apartment building, rendered uninhabitable by carbon monoxide, constituted a direct physical loss); *Western Fire Ins. Co.*, 165 Colo. at 40, 437 P.2d 5243 (holding the loss of use of church, rendered uninhabitable by gasoline vapors, constituted a direct physical loss).

Defendant's citation to cases like *Mama Jo's, Inc. v. Sparta Insurance Co.*, No. 17-CV-23362- KMM, 2018 WL 3412974 (S.D. Fla. June 11, 2018), is misplaced. In *Mama Jo's* the insured attempted to recover for construction dust entering its restaurant, but "the restaurant remained open every day, customers were always able to access the restaurant, and there is no evidence that dust had an impact on the operation other than requiring daily cleaning." *Id.* at \*25.

By contrast, the SARS-CoV-2 virus is inherently noxious and its presence, presumed presence, or imminently threatened presence renders a restaurant unusable or unsafe for its intended purpose. *See, e.g., Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at \*29 ("Although the mere adherence of molecules to porous surfaces, without more, is not physical loss or damage, this case involves more, namely the inability . . . to enjoy the personal property because of the mold spores adhering to it."); *Cooper & Olive Indus. v. Travelers Indem. Co.*, No. C-01-2400, 2002 WL 32775680, at \*5 (N.D. Cal. Nov. 4, 2002) (policyholder could claim business income and losses from contamination of well with E. coli bacteria); *Pillsbury Co. v. Underwriters at Lloyd's*, 705 F. Supp. 1396, 1401 (D. Minn. 1989) (creamed corn products suffered physical loss or damage where product was under-processed, causing contamination and its eventual destruction).

Page 9 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

Exhibit A
Page 9 of 14

Better reasoned decisions find "physical loss or damage" where the loss is temporary, or the reduction in utility is partial. For example, in *Gregory Packaging, Inc. v. Travelers Property Casualty Co.*, No. 2:12-cv-04418, 2014 WL 6675934 (D. N.J. Nov. 25, 2014), the insurance company argued a manufacturing plant that was evacuated following the release of ammonia had not suffered physical loss or damage because the ammonia was remediated over the course of a week. The court rejected this rationale, holding "the property [could] sustain physical loss or damage without experiencing structural alteration," and there was physical loss or damage to the plant from ammonia because "the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." *Id*. at *16-*17. Similarly, "even where some utility remains" in a business operation, a physical condition that renders a property unusable for its intended use constitutes physical loss or damage. *Cook v. Allstate Ins. Co*., No. 48D02-0611-PL-01156, at *9-*10 (Ind. Super. Nov. 30, 2007); *see also Stack,* 2007 WL 464715, at *8.

## II.    BOTH CONTAMINATION AND SUSPECTED CONTAMINATION CAN CAUSE "PHYSICAL LOSS OF OR DAMAGE"

### A.    The Novel Coronavirus Is a Noxious and Disease-Causing Agent that Can Remain Aerosolized and Is Able to Attach to Surfaced for Prolonged Periods of Time

Suspected contamination of property by the novel coronavirus is enough to damage insured property. As was recently noted by the Pennsylvania Supreme Court,

> The enforcement of social distancing to suppress transmission of the disease is currently the only mitigation tool . . . COVID-19 does not spread because the virus is 'at' a particular location. Instead it spreads because of person-to-person contact . . . [and] [t]he virus can live on surfaces for up to four days and can remain in the air within confined areas and structures.

*Friends of DeVito v. Wolf*, No. 68 MM 2020, at *38-*39 (Pa. April 13, 2020).

Page 10 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

There is no commercial method to test for the presence of SARS-CoV-2 on property, many infected by SARS-CoV-2 are asymptomatic yet able to transmit the virus, and as hundreds use restaurants daily, it is statistically certain that the virus was and continues to be present in high-trafficked restaurants.  Physical loss or damage is therefore presumed.

The risk of transmission and property damage is heightened in restaurants, where air is recirculated, space is limited, surfaces are touched by multiple people, and tables turnover frequently.  A recent study published by the U.S. Centers for Disease Control illustrates this point—describing how one asymptomatic patron, at an air-conditioned restaurant in Guangzhou, China, infected nine other diners from three different tables.  *See*

https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article.

### B.    Physical Contamination of the Insured Property Can Cause Physical Loss or Damage

The insurance industry knows viruses can cause physical loss or damage as evidenced by the creation of a virus exclusion endorsement following the SARS pandemic in the early 2000s.  *See* Insurance Services Office ("ISO") form CP 01 40 07 06 "Exclusion of Loss Due to Virus or Bacteria."  While the presence of such an exclusion does not necessarily preclude coverage, the failure to include such an exclusion:  (1) undermines an insurer's attempt to re-write an existing policy post-loss to deny claims involving viruses; and (2) confirms that viruses are covered causes of loss that can cause physical loss and damage under an all-risk policy, like Plaintiff's policy.

And case law has long supported the proposition that contamination of a property, or the surrounding area, by a disease-causing or noxious agent causes physical loss or damage when it is present in/around the property and/or permeates the interior of insured property.  *See,*

Page 11 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-1440-8641.2

*e.g., Schlamm Stone & Dolan, LLP v. Seneca Ins. Co.*, 800 N.Y.S.2d 356 (N.Y. Sup. Ct. 2005) (noxious particles present in the insured property constituted property damage under the terms of the policy); *Azalea, Ltd. v. Am. States Ins. Co.*, 656 So. 2d 600, 602 (Fla. Dist. Ct. App. 1995) (physical loss and damage where unknown substance adhered to surfaces of insured property); *Am. All. Ins. Co. v. Keleket X-Ray Corp.*, 248 F.2d 920, 925 (6th Cir. 1957) (contamination of property with radioactive dust and radon gas were present in property thereby causing physical loss and damage).  Thus, structural alteration does not have to be *visible* to be *physical*.

**C.    Presumed, Suspected, or an Imminent Threat of Contamination of the Insured Property Can Constitute Physical Loss or Damage**

Courts have also held there does not have to be actual contamination of property, so long as a physical cause imminently threatens a property's function or habitability.  *See, e.g., Port Auth. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (physical loss or damage results "if an actual release of asbestos fibers from asbestos-containing materials has resulted in contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility" (emphasis added)); *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 352 (8th Cir. 1986) (policyholder could claim business income coverage where risk of collapse necessitated abandonment of grocery store).

/ / /

/ / /

/ / /

/ / /

Page 12 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-1440-8641.2

## **CONCLUSION**

Contamination, suspected contamination, and/or the imminent threat of contamination by SARS-CoV-2 that result in the suspension of business operations can constitute "physical loss of or damage" under a property insurance policy. Structural alteration of the property is not required for "physical loss of or damage" where the property can no longer serve or is unsafe for its intended purpose.

*Amici* respectfully request that this Court consider these issues, ubiquitous in nearly every COVID-19 business interruption and civil authority case nationwide, in denying Defendant's motion to dismiss.

DATED this 10th day of July, 2020.

MILLER NASH GRAHAM & DUNN LLP

*s/ Seth H. Row*

Seth H. Row, OSB No. 021845
seth.row@millernash.com
Katelyn J. Fulton, OSB No. 183404
katelyn.fulton@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155

*Attorneys for Amici Curiae United Policyholders
and National Independent Venue Association*

Page 13 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Motion to Appear Amicus using the United States District Court for the District of Oregon's CM/ECF service, which will send notification of such filing to all counsel of record on this 10th day of July 2020.

 *s/ Seth H. Row*
Seth H. Row, OSB No. 021845
*Attorneys for Amici Curiae United Policyholders*
*and National Independent Venue Association*

Page 1 -    Certificate of Service

4837-1440-8641.2

Exhibit A
Page 14 of 14

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing Motion to Appear Amicus using the United States District Court for the District of Oregon's CM/ECF service, which will send notification of such filing to all counsel of record on this 10th day of July 2020.

 *s/ Seth H. Row*
Seth H. Row, OSB No. 021845
*Attorneys for Amici Curiae United Policyholders and National Independent Venue Association*

Page 1 -    Certificate of Service

4848-6049-8370.1