**Seth H. Row**, OSB No. 021845
seth.row@millernash.com
**Katelyn J. Fulton**, OSB No. 183404
MILLER NASH GRAHAM & DUNN LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  503.224.5858
Facsimile:  503.224.0155

*Attorneys for Proposed Amici Curiae United
Policyholders, Business Interruption Group,
and National Independent Venue Association*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DAKOTA VENTURES, LLC d/b/a KOKOPELLI GRILL and COYOTE BBQ PUB, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>OREGON MUTUAL INSURANCE CO.,<br><br>        Defendant. | No. 3:20-cv-00630-HZ<br><br>BRIEF OF *AMICI CURIAE* UNITED POLICYHOLDERS, BUSINESS INTERRUPTION GROUP, AND NATIONAL INDEPENDENT VENUE ASSOCIATION IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |

**<u>INTRODUCTION</u>**

Through this brief, as supplementary to Plaintiff's opposition to Defendant's

Motion to Dismiss, *amici curiae* United Policyholders, Business Interruption Group ("BIG"),

Page 1 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

and the National Independent Venue Association ("NIVA") (collectively, *"Amici"*)[1] seek to address the limited issue that certain causes of loss can be alleged to have caused "direct physical loss of or damage."

## I.     INTEREST OF *AMICI* IN THIS MATTER

The issue of whether the current pandemic can cause "direct physical loss of or damage to" property—part of the coverage grant of Plaintiff's policy—is at the forefront of COVID-19-related business interruption litigation in Oregon and nationwide. This Court's treatment of this issue has the potential to affect a multitude of other claims made by policyholders not only in Oregon, but across the nation.[2] This undefined language is found in most property insurance policies. This Court's ruling on Defendant's motion to dismiss will likely be cited in future cases in Oregon and elsewhere, and will influence negotiation of claims that are not yet in litigation as well.

As described in *Amici*'s Motion to Appear as *Amici Curiae*, to which this brief is attached, *Amici* includes trade organizations–BIG[3] and NIVA[4]–with members across the country

---

[1] Pursuant to Fed. R. App. Procedure 29(a)(4), *Amici* affirm that no party's counsel authored this brief, that no party or party's counsel contributed money to any *Amicus Curiae* party that was intended to fund preparing or submitting this brief, and no person contributed money that was intended to fund preparing or submitting the brief.

[2] On August 25, 2020, the Western District of Washington ordered the transfer to the District of Oregon of *Nue LLC dba Nue Seattle v. Oregon Mutual Ins. Co.*, Case no. 3:20 cv 1449 (D. Oregon) (another SARS-CoV-2 business interruption case), marked as related to this case. The implication is that any decision that the Court makes in this case will impact or control the outcome of *Nue* as well.

[3] Information available at https://werbig.org/ (last visited July 1, 2020).

[4] Information available at https://www.nivassoc.org/ (last visited July 1, 2020).

Page 2 -     Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

that collectively employ tens of thousands of people and contribute enormously to their local economies.

Nationally, arts and culture organizations including venues like the members of NIVA contributed over $800 billion to the nation's GDP.[5] In 2017 over 43% of U.S. adults attended at least one live performing arts event.[6] The arts sector employs over 67,000 people in Oregon alone, adding over $8 billion to the state economy.[7] But like the restaurant industry, the performing arts sector has been almost completely shut down by the pandemic.[8] Nationally, the live music industry is predicted to lose almost $8 billion in revenue if performances cannot resume in 2020.[9] Locally, NIVA members such as Roseland Theater,[10] Mississippi Studios and Revolution Hall[11] have had to cancel performances and lay off employees, incurring substantial business income losses and putting their businesses in jeopardy.[12]

---

[5] See https://www.arts.gov/news/2020/during-economic-highs-and-lows-arts-are-key-segment-us-economy (last visited July 1, 2020).

[6] See https://www.icpsr.umich.edu/web/pages/NADAC/index.html (last visited July 1, 2020).

[7] See https://www.arts.gov/artistic-fields/research-analysis/arts-data-profiles/arts-data-profile-25 (last visited July 1, 2020).

[8] See https://www.wyden.senate.gov/imo/media/doc/2020.05.21%20-%20Wyden-Merkley%20Letter%20to%20leadership%20on%20live%20event%20venues_final_updated.pdf (letter from United States Senators regarding aid to live music venues) (last visited July 1, 2020).

[9] See https://www.pollstar.com/article/pollstar-projects-2020-total-box-office-would-have-hit-122-billion-144197 (last visited July 1, 2020).

[10] See http://roselandpdx.com/ (last visited July 1, 2020).

[11] See https://mississippistudios.com/ and https://www.revolutionhall.com/ (last visited July 1, 2020).

[12] See https://www.wweek.com/news/2020/07/01/the-city-council-weighs-putting-federal-bailout-money-in-the-hands-of-distressed-individuals-versus-saving-entertainment-venues/ (last visited July 1, 2020).

Page 3 -     Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

Plaintiff Dakota Ventures is among the very many restaurants—such as the members of BIG—whose existence has been put in jeopardy by the pandemic. According to the National Restaurant Association, the restaurant industry is one of the nation's largest private sector employers, providing jobs to 15.6 million Americans with a total economic impact of over $2.6 trillion.[13] Restaurants have suffered the most significant job losses since the pandemic began, with 2 out of every 3 employees having lost their jobs and over 8 million restaurant employees laid off or furloughed.[14] Four out of every 10 restaurants nationally are or have been completely closed.[15] Locally, over 211,000 people are employed in the Oregon foodservice industry,[16] but over 80% of those workers have been laid off or furloughed,[17] and as of late April over 4% of Oregon restaurants had closed permanently due to business income losses that made resuming operations impossible, with an expectation that many more would close.[18]

Many of these businesses have made business interruption claims on policies with language similar to the language found in Plaintiff's policy, and have had their claims denied, to disastrous effect. As explained by one court in 2008, "[t]he purpose of business interruption

---

[13] *See* https://www.restaurant.org/downloads/pdfs/research/soi/2020-state-of-the-industry-factbook.pdf (last visited July 1, 2020).

[14] *See* https://restaurant.org/manage-my-restaurant/business-operations/covid19/research/industry-research (last visited July 1, 2020).

[15] *Id*.

[16] *See* https://www.restaurant.org/downloads/pdfs/state-statistics/oregon.pdf (last visited July 1, 2020); see also https://www.oregonrla.org/facts.html (last visited July 1, 2020).

[17] *See* https://www.oregonlive.com/coronavirus/2020/04/over-80-percent-of-oregon-restaurant-workers-have-been-laid-off-or-furloughed-due-to-the-coronavirus-shutdown.html (last visited July 1, 2020).

[18] *See* https://www.oregonlive.com/coronavirus/2020/05/oregon-restaurants-and-bars-that-closed-permanent-during-coronavirus-crisis.html (last visited July 1, 2020).

Page 4 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

insurance cannot be clearer – to ensure that [the policyholder] had the financial support necessary to sustain its business in the event disaster occurred… Certainly, many business policyholders… lack the resources to continue business operations without insurance proceeds." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 194, 886 N.E.2d 127, 131 (2008).  Furthermore, continued the *Bi-Economy* court, "the purpose of the contract was not just to receive money, but to receive it promptly so that in the aftermath of a calamitous event, as Bi–Economy experienced here, the business could avoid collapse and get back on its feet as soon as possible." *Id.*, 886 N.E.2d at 132.

The insurance industry's wholesale, across-the-board denial of all claims for business interruption losses related to the 2020 pandemic[19] has produced exactly the kind of calamity predicted by the *Bi-Economy* court.  According to an ongoing study sponsored by the University of Pennsylvania, more than one thousand lawsuits have been filed across the country against insurers for business interruption losses, most (over 380) filed by food-related companies.[20]  There are reportedly over 225 motions to dismiss filed in these cases.[21]

This Court's ruling has the potential to impact the Oregon members of *Amici,* as well as the claims of hundreds of other members of BIG and NIVA, and the claims of the

---

[19] *See* https://www.reuters.com/article/us-health-coronavirus-chubb-wiesenthal/simon-wiesenthal-center-sues-chubb-to-ensure-coronavirus-insurance-coverage-idUSKBN22B2NP (quoting a Chubb executive as saying that "The industry will fight this tooth and nail."); *see also* https://www.washingtonpost.com/business/2020/04/22/businesses-insurance-coverage-coronavirus/ (last visited July 2, 2020).

[20] *See* https://cclt.law.upenn.edu/ (last visited August 21, 2020).

[21] *Id.*

Page 5 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

thousands of other restaurants and Oregon businesses and elsewhere that have had their business interruption claims denied.

## II.    SUMMARY OF ARGUMENT

As set forth herein, Defendant's position regarding interpretation of the coverage grant has been widely rejected. Defendant chose not to define the phrase "direct physical loss of or damage to" in the policy issued to Plaintiff. Under Oregon law, the presence of a physical substance itself, such as a noxious or disease-causing agent in and around the insured property, can constitute "direct physical loss of or damage to" property, and business interruption coverage may be triggered where infiltration into insured property causes a "necessary suspension" (either completely or in part) of the insured business's "operations."[22]

In addition, Oregon law is clear that *structural* alteration of covered property is not a necessary element of "direct physical loss of or damage,"[23] especially where the insured property is otherwise rendered unusable or unusable for its intended purpose.

## ANALYSIS

## I.    THE ALLEGED PRESENCE OF SARS-COV-2 IN OR ON INSURED PREMISES STATES A CLAIM FOR "PHYSICAL LOSS OF OR DAMAGE"

### A.    The Novel Coronavirus Is a Noxious and Disease-Causing Agent that Can Remain Aerosolized and Is Able to Attach to Surfaces for Prolonged Periods of Time

The alleged presence of the novel coronavirus is clearly sufficient to state a claim that insured property has suffered direct physical loss or damage. There is no commercial

---

[22] Policy language found at Ct. Rec. 1-1 at 12.

[23] Policy language found at Ct. Rec. 1-1 at 6, *et seq.* Plaintiff's policy contains the construction "direct physical loss of or damage to," while other policies use the construction "direct physical loss or damage to," omitting the word "of" after "loss." The potential impact of the presence of the word "of" is beyond the scope of this brief.

Page 6 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

method to test for the presence of SARS-CoV-2 on property, many infected by SARS-CoV-2 are asymptomatic yet able to transmit the virus, and as hundreds use restaurants daily, it is statistically certain that the virus was and continues to be present in high-trafficked restaurants. Physical loss or damage is therefore presumed, and if alleged (as plaintiff has done here), that is clearly enough to pass muster at the motion to dismiss stage.

The physical loss or damage caused by the prevalence of the virus is heightened in restaurants, where air is recirculated, space is limited, surfaces are touched by multiple people, and tables turn over frequently. A study published by the U.S. Centers for Disease Control in July illustrates this point—describing how one asymptomatic patron, at an air-conditioned restaurant in Guangzhou, China, infected nine other diners from three different tables. *See* https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article.

### B. The Physical Presence of a Tangible Substance in the Air of or on Surfaces of Insured Property Can Cause Physical Loss or Damage

As the phrase "direct physical loss of or damage" in Plaintiff's policy is undefined, each word is given its ordinary or plain meaning. *Bighorn Logging Corp. v. Truck Ins. Exch.*, 295 Or. App. 819, 829, 437 P.3d 287, 294, *review den*ied, 365 Or. 195, 451 P.3d 975 (2019).

Defendant's argument that "direct physical loss of or damage" under its Policy requires visible or structural alteration of an insured structure has been rejected by Oregon courts. In *Farmers Ins. Co. v. Trutanich*, 123 Or. App. 6, 858 P.2d 1332 (1993), the Oregon Court of Appeals held that a pervasive odor from a methamphetamine lab in a rental home was "accidental direct physical loss" despite the insurer's argument that odor is not "physical." *Id.*, 123 Or. App. at 10. In doing so the Oregon court adopted the reasoning of *Western Fire Ins. Co.*

Page 7 -     Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

*v. First Presbyterian Church,* 165 Colo. 34, 437 P.2d 52 (1968), in which the court held that a church that was closed due to gasoline vapors infiltrating the building had not merely suffered "loss of use" but had suffered "direct physical loss." *Id.*, 165 Colo. at 40, 437 P.2d 52; *see Trutanich*, 123 Or. App. at 11 (adopting *Western Fire v. First Presbyterian*); *Oregon Shakespeare Festival Assoc. v. Great Am. Ins. Co.*, No. 15-01932, 2016 WL 3267247, *5 (D. Or. June 7, 2016), *order vacated by stipulation*, 2017 WL 1034203 (Mar. 6, 2017) (business suffered "direct physical loss of or damage to" its property when wildfire smoke in the air led to closures of outdoor theater due to health concerns, rejecting insurer's argument that air is not covered or not physical: "[c]ertainly, air is not mental or emotional, nor is it theoretical.").

The insurance industry knows viruses can cause physical loss or damage as evidenced by the creation of a virus exclusion endorsement following the SARS pandemic in the early 2000s. *See* Insurance Services Office ("ISO") form CP 01 40 07 06 "Exclusion of Loss Due to Virus or Bacteria." While the presence of such an exclusion does not necessarily preclude coverage, the failure to include such an exclusion: (1) undermines an insurer's attempt to re-write an existing policy post-loss to deny claims involving viruses; and (2) confirms that viruses are covered causes of loss that can cause physical loss and damage under an all-risk policy, like Plaintiff's policy.

And case law has long supported the proposition that infiltration of a property, or the surrounding area, by a disease-causing or noxious agent causes physical loss or damage when it is present in/around the property and/or permeates the interior of insured property. *See, e.g., Schlamm Stone & Dolan, LLP v. Seneca Ins. Co.*, 800 N.Y.S.2d 356 (N.Y. Sup. Ct. 2005) (noxious particles present in the insured property constituted property damage under the terms of

Page 8 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

the policy); *Azalea, Ltd. v. Am. States Ins. Co.*, 656 So. 2d 600, 602 (Fla. Dist. Ct. App. 1995) (physical loss and damage where unknown substance adhered to surfaces of insured property); *Am. All. Ins. Co. v. Keleket X-Ray Corp.*, 248 F.2d 920, 925 (6th Cir. 1957) (contamination of property with radioactive dust and radon gas were present in property thereby causing physical loss and damage).  Thus, structural alteration does not have to be *visible* to be *physical*.

### C.    Recent Decisions From the Western District of Missouri Have Held that the Presence of SARS-CoV-2 Can Constitute "Physical Loss or Damage," Defeating a Motion to Dismiss

On August 12, 2020, U.S. District Judge Stephen Bough of the Western District of Missouri considered an insurance company's motion to dismiss based on the exact issues that are now before this Court.  *See Studio 417, Inc., et al. v. The Cincinnati Ins. Co.*, Case No. 20-cv-03127-SRB (Order, W.D. Mo. Aug. 12, 2020).[24]  In *Studio 417*, the plaintiffs (restaurants and a hair salon) purchased all-risk property insurance policies from Cincinnati.  Those policies provided that Cincinnati would pay for a "Covered Cause of Loss", defined as "accidental [direct] physical loss *or* accidental [direct] physical damage."  *Id.* at 2.  The policies did not define "physical loss" or "physical damage", and did not include exclusions for losses caused by viruses or communicable diseases.  *Id.*

After the defendant insurance company denied coverage for plaintiffs' business income loss resulting from the pandemic and related governmental orders to restrict operations, the plaintiffs sued the defendant under the provisions for Business Income coverage, Civil Authority coverage, Ingress and Egress coverage, and Sue and Labor coverage.  Plaintiffs

---

[24] Judge Bough issued the same ruling in another case involving Cincinnati Insurance, *K.C. Hopps, Ltd. v. The Cincinnati Insurance Company,* Case No. 20-cv-00437-SRB (Order, W.D. Mo., August 12, 2020), which incorporated by reference the ruling in *Studio 417*.

Page 9 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

alleged that COVID-19 "renders physical property in their vicinity unsafe and unusable and that they were forced to suspend or reduce business at their covered premises" and therefore "COVID-19 and the Closure Orders caused a direct physical loss or direct physical damage to their premises by denying use of and damaging the covered property, and by causing a necessary suspension of operations during a period of restoration." *Id.* at 4 (internal quotations omitted). The insurer filed a motion to dismiss, arguing that "direct physical loss requires actual, tangible, permanent, physical alteration of property." *Id.* at 7.

Judge Bough denied the defendant's motion to dismiss finding that plaintiffs had adequately stated a claim for direct physical loss. *Id.* at 8. First, the court noted that, "because the Policies do not define a direct physical loss, the Court must rely on the plain and ordinary meaning of the phrase." *Id.*

> "The Merriam-Webster dictionary defines 'direct' in part as 'characterized by close logical, causal, or consequential relationship.' 'Physical' is defined as 'having material existence: perceptible especially through the senses and subject to the laws of nature.' 'Loss' is 'the act of losing possession' and 'deprivation.'
>
> Applying these definitions, Plaintiffs have adequately alleged a direct physical loss. Plaintiffs allege a causal relationship between COVID-19 and their alleged losses. Plaintiffs further allege that COVID-19 'is a physical substance,' that it 'live[s] on' and is 'active on inert physical surfaces,' and is also 'emitted into the air.' COVID-19 allegedly attached to and deprived Plaintiffs of their property, making it 'unsafe and unusable, resulting in direct physical loss to the premises and property.' Based on these allegations, the Amended Complaint plausibly alleges a 'direct physical loss' based on 'the plain and ordinary meaning of the phrase.'"

*Id.* (internal citations omitted). Furthermore, Judge Bough noted that the trial court "must give meaning to all [policy] terms and, where possible, harmonize those terms in order to accomplish

Page 10 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

the intention of the parties." *Id.* The court concluded that "Defendant conflates 'loss' and 'damage' in support of its argument that the Policies require a tangible, physical alteration. However, the Court must give meaning to both terms." *Id.* at 9 (citing *Nautilus Grp., Inc. v. Allianz Global Risks US*, No. C11-5281BHS, 2012 WL 760940, at *7 (W.D. Wash. Mar. 8, 2012) (stating that "if 'physical loss' was interpreted to mean 'damage,' then one or the other would be superfluous"). Judge Bough therefore denied the defendant insurer's motion to dismiss.

The standards and analysis applied by Judge Bough in *Studio 417* are nearly identical to the analytical standards used by Oregon courts, as described above. Therefore, *Studio 417* is persuasive authority supporting Plaintiff's position here.

Defendant's Motion to Dismiss cites multiple recent decisions from other insurance disputes stemming from the COVID-19 pandemic that Defendant claims support dismissal of the complaint. *See* Defendant's Motion to Dismiss at 17-19. However, the *Studio 417* Court directly addresses and dismisses as inapplicable many of the cases Defendant cites. For example, Defendant cites *Social Life Magazine, Inc. v. Sentinel Ins. Co.*, No. 1:20-cv-3311, Tr. at 15 (S.D.N.Y. May 14, 2020), for the proposition that COVID-19 does not cause direct physical loss or damage to the property. But, as noted by the *Studio 417* Court, "[r]egardless of the allegations in *Social Life* or other cases, Plaintiffs here have plausibly alleged that COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable. This is enough to survive a motion to dismiss." *Studio 417, Inc.*, Case No. 20-cv-03127-SRB at 12. Defendant also cited *Gavrilides Mgmt. Co., LLC v. Michigan Ins. Co.*, Case No. 20-258-CB (Ingham County, Mich. July 1, 2020) for the proposition that "loss due to government orders related to the COVID-19 virus did not constitute 'direct physical loss of or

Page 11 -   Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

damage to property'" because there "has to be something that physically alters the integrity of the property." Defendant's Motion to Dismiss at 18-19. But, as noted by the *Studio 417* Court, "*Gavrilides* is distinguishable, in part, because the court recognized that 'the complaint also states a[t] no time has Covid-19 entered the Soup Shop of the Bistro . . . and in fact, states that it has never been present in either location." *Studio 417, Inc.*, Case No. 20-cv-03127-SRB at 12, n.5. Furthermore, the *Gavrilides* decision was issued at the summary judgment stage, not at the motion to dismiss stage.

The other cases cited by Defendant are similarly distinguishable. *See Rose's 1, LLC, et al. v. Erie Insurance Exchange*, No. 2020 CA 002424 B (DC Superior Court Aug. 6, 2020) (decision issued at summary judgment stage and plaintiffs offered no evidence that COVID-19 was present at time they were forced to close); *see also Diesel Barbershop, LLC, et al. v. State Farm Lloyds*, No. 5:20-CV-461-DAE (W.D. Tex. Aug. 13, 2020) (policies included viral exclusion and plaintiffs argued civil orders, rather than presence of COVID-19 itself, caused direct physical loss).

II.    **THE INABILITY TO USE A RESTAURANT FOR ITS INTENDED PURPOSE DUE TO THE PANDEMIC, EVEN WITHOUT THE ACTUAL PRESENCE OF SARS-COV-2, ALSO CONSTITUTES "DIRECT PHYSICAL LOSS OF OR DAMAGE"**

A.    **Threatened, Imminent Physical Presence of SARS-CoV-2 That Impacts Usability Is Sufficient to Constitute "Physical Loss of or Damage"**

Courts have also held there does not have to be actual infiltration of a substance onto property, so long as a physical cause imminently threatens a property's function or habitability. *See, e.g., Port Auth. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (physical loss or damage results "if an actual release of asbestos fibers from asbestos-containing materials has resulted in contamination of the property such that its function is nearly eliminated

Page 12 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

or destroyed, or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility" (emphasis added)); *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 352 (8th Cir. 1986) (policyholder could claim business income coverage where risk of collapse necessitated abandonment of grocery store).

Many courts have found that structural damage is not required to show "physical loss or damage" where the insured property cannot be used for or is unsafe for its intended purpose. *Travco Ins. Co. v. Ward*, No. 715 F. Supp. 2d 699, 708 (E.D. Va. 2010) (noting that the majority of cases nationwide find that physical damage to property is not necessary where, at least, the property has been rendered unusable by a covered cause of loss); *see also Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) ("Direct physical loss also may exist in the absence of structural damage to the insured property." (citations omitted)). This is so because:

> To accept [the insurance company's] interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. *Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.*

*Hughes v. Potomac Ins. Co.*, 18 Cal. Rptr. 650, 655 (Cal. Dist. Ct. App. 1962) (emphasis added).

Oregon law supports this view. Under a property insurance policy, the diminution of value of something, including through the failure of something to sustain its "essential

Page 13 -   Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

functionality," can constitute a physical loss. *Oregon Shakespeare Festival*, 2016 WL 3267247, at *9.

As is the case in most property insurance policies, Plaintiff's policy was composed of standardized forms that were entirely within Defendant's control to draft or revise. Defendant chose not to include the word "structural," "visible," or any other term as a modifier to the terms "loss of" or "damage." As in most states, under Oregon law the insurer must bear the consequences of poor drafting and the choices that the insurer made in crafting its own policy language. *See N Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 29, 22 P.3d 739 (2001). The insurer may not re-word its policy or insert terms that are not present to effectuate what the insurer now claims was its intent. *Id.* Having failed to narrow "loss of or damage" to "structural" or even "visible" *damage*, let alone defining what the difference is between "loss" and "damage," Defendant cannot now be heard to contend that it *meant* to include those terms.

**B.      A Property's Unsuitability for an Intended Purpose Constitutes "Physical Loss Of or Damage"**

"In determining damage covered by insurance, [a] court must consider the nature and intended use of property, and the purpose of the insurance contract." *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at *28 (D. Or. June 18, 2002). A dine-in restaurant's intended purposes include providing a safe *physical* environment for its occupants (employees and customers), and the use and enjoyment of that physical property by its customers without being placed in a dangerous situation.

The inability to use the property or a portion of the property for its intended use constitutes a direct physical loss. *Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Connecticut*, No. CIV. 05-1315-JE, 2007 WL 464715, at *8 (D. Or. Feb. 7, 2007) (loss of

Page 14 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

income from damage to furnace covered although furnace could still be used, because damage rendered it unusable to treat medical products for which it had been specially certified); *see also Matzner v. Seaco Ins. Co.*, No. 96-0498-B, 1998 WL 566658 (Mass. Super. Aug. 26, 1998) (holding the loss of use of apartment building, rendered uninhabitable by carbon monoxide, constituted a direct physical loss); *Western Fire Ins. Co.*, 165 Colo. at 40, 437 P.2d 5243 (holding the loss of use of church, rendered uninhabitable by gasoline vapors, constituted a direct physical loss).

Defendant's citation to cases like *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-CV-23362-KMM, 2018 WL 3412974, at *1 (S.D. Fla. June 11, 2018), *aff'd*, No. 18-12887, 2020 WL 4782369 (11th Cir. Aug. 18, 2020), is misplaced. In *Mama Jo's* the insured attempted to recover for construction dust entering its restaurant, but "the restaurant remained open every day, customers were always able to access the restaurant, and there is no evidence that dust had an impact on the operation other than requiring daily cleaning." *Id.* at *25.

By contrast, the SARS-CoV-2 virus is inherently noxious and even its presumed presence or imminently threatened presence renders a restaurant unusable or unsafe for its intended purpose. *See, e.g., Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at *29 ("Although the mere adherence of molecules to porous surfaces, without more, is not physical loss or damage, this case involves more, namely the inability . . . to enjoy the personal property because of the mold spores adhering to it."); *Cooper & Olive Indus. v. Travelers Indem. Co.*, No. C-01-2400, 2002 WL 32775680, at *5 (N.D. Cal. Nov. 4, 2002) (policyholder could claim business income and losses from contamination of well with E. coli bacteria); *Pillsbury Co. v. Underwriters at Lloyd's*, 705 F. Supp. 1396, 1401 (D. Minn. 1989) (creamed corn products

Page 15 -   Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

suffered physical loss or damage where product was under-processed, causing contamination and its eventual destruction).

Nor is it dispositive that the threat creating the loss of utility may be temporary. Better reasoned decisions find "physical loss or damage" where the loss is temporary, or the reduction in utility is partial. For example, in *Gregory Packaging, Inc. v. Travelers Property Casualty Co.*, No. 2:12-cv-04418, 2014 WL 6675934 (D. N.J. Nov. 25, 2014), the insurance company argued a manufacturing plant that was evacuated following the release of ammonia had not suffered physical loss or damage because the ammonia was remediated over the course of a week. The court rejected this rationale, holding "the property [could] sustain physical loss or damage without experiencing structural alteration," and there was physical loss or damage to the plant from ammonia because "the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." *Id*. at *16-*17. Similarly, "even where some utility remains" in a business operation, a physical condition that renders a property unusable for its intended use constitutes physical loss or damage. *Cook v. Allstate Ins. Co.*, No. 48D02-0611-PL-01156, at *9-*10 (Ind. Super. Nov. 30, 2007); *see also Stack,* 2007 WL 464715, at *8.

## CONCLUSION

The presence, suspected presence, or the imminent threat of the presence of the deadly SARS-CoV-2 virus that results in the suspension of business operations can constitute "physical loss of or damage" under a property insurance policy. Neither structural alteration nor permanent alteration of the property are required for "physical loss of or damage," where the property can no longer serve, or is unsafe for, its intended purpose.

/ / /

Page 16 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

*Amici* respectfully request that this Court consider these issues, ubiquitous in nearly every COVID-19 business interruption and civil authority case nationwide, in denying Defendant's motion to dismiss.

DATED this 27th day of August, 2020.

MILLER NASH GRAHAM & DUNN LLP

*s/ Seth H. Row*

Seth H. Row, OSB No. 021845
seth.row@millernash.com
Katelyn J. Fulton, OSB No. 183404
katelyn.fulton@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155

*Attorneys for Amici Curiae United Policyholders, Business Interruption Group, and National Independent Venue Association*

Page 17 -    Brief of *Amici Curiae* In Support of Opposition to Motion to Dismiss

4837-5898-9768.8

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing Motion to Appear Amicus using the United States District Court for the District of Oregon's CM/ECF service, which will send notification of such filing to all counsel of record on this 27th day of August, 2020.

*s/ Seth H. Row*

Seth H. Row, OSB No. 021845
*Attorneys for Amici Curiae United Policyholders, Business Interruption Group, and National Independent Venue Association*

Page 1 -    Certificate of Service

4837-5898-9768.8